**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DTN, LLC,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:26-cv-00766-N** |
| | § | |
| **GRAVITATE ENERGY, LLC AND CAPSPIRE, LLC,** | § | |
| | § | |
| | § | |
| ***Defendants.*** | § | |

**FIRST AMENDED COMPLAINT**

Plaintiff DTN, LLC ("DTN") files this First Amended Complaint against Defendants Gravitate Energy, LLC ("Gravitate") and capSpire, LLC ("capSpire" and collectively with Gravitate, "Defendants") and, in support thereof, respectfully states as follows:

**PARTIES**

1. Plaintiff DTN is a Delaware limited liability company registered to conduct business in Texas.

2. Defendant Gravitate Energy, LLC is a Delaware limited liability company registered to conduct business in Texas. Gravitate may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

3. Defendant capSpire, LLC is a Delaware limited liability company registered to conduct business in Texas. capSpire may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331 and 1338 because DTN asserts claims arising under the Copyright Act (17 U.S.C. § 101 et seq.) and the Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.). The Court has subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over Gravitate because Gravitate transacts business in Texas, has purposefully directed its wrongful acts at Texas customers and suppliers, and caused injury to DTN in this District. Gravitate has circulated the infringing specifications to entities with Texas operations and has targeted DTN's Texas-based relationships. Further, Gravitate maintains an office at 4300 N. Central Expressway, Suite 310, Dallas, Texas 75206.

6. This Court has personal jurisdiction over capSpire because capSpire transacts business in Texas, has purposefully availed itself of the privilege of conducting activities in Texas, and has purposefully directed tortious conduct at this forum. capSpire knowingly participated in and furthered the wrongful conduct alleged herein in coordination with Gravitate to develop, circulate, and promote the infringing specification, with the understanding and intent that such conduct would cause harm to DTN in Texas. Further, capSpire maintains an office at 8350 N. Central Expressway, Suite 1440, Dallas, Texas 75206.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(a) because a substantial part of the events giving rise to the claims occurred in this District, both Defendants maintain offices and conduct substantial business operations within this District, and both Gravitate and capSpire are subject to the Court's personal jurisdiction.

8. Further, upon information and belief, the tortious conduct of Defendants was directed, coordinated, and controlled by officers, members, and agents of Defendants who reside and transact business within this District. Specifically, Bernard Wehbe is one such officer and/or

governing person of both Defendants that resides and transacts business within this District at 4300 N. Central Expressway, Suite 310, Dallas, Texas 75206, and, upon information and belief, directed at least some of the tortious conduct of Defendants.

## BACKGROUND FACTS

### *DTN's Role in the Refined Fuels Industry*

9. DTN is a global data and technology company that provides decision-support software, data, and analytics to customers in agriculture, energy, and weather-driven industries. DTN's core business is delivering real-time, decision-grade information that helps operational and commercial users manage risk, optimize pricing and supply, and respond to changing market and weather conditions.

10. Within the energy industry, DTN operates in the refined fuels subsector. Refined fuels are finished fuels produced by processing crude oil at petroleum refineries through distillation, conversion, and treatment processes. Refining separates crude oil into different fractions and upgrades them into usable fuels that meet commercial, safety, and regulatory specifications.

11. After refining, refined fuels are transported in bulk to regional fuel terminals. Terminals are large-scale storage and distribution facilities where refined fuels are received, inventoried, and stored. Terminals serve as the primary logistical hub between refineries and retail markets and represent the last point in the supply chain where fuels are handled in bulk before retail distribution.

12. From the terminal, refined fuels are delivered to end-use locations through last-mile distribution. Dispatchers receive delivery orders from downstream customers, including retail gas stations and commercial fuel consumers, and dispatch carriers to load fuel at the terminal's loading

rack. At the rack, refined fuels are loaded into tanker trucks for delivery to retail locations, where the fuel is dispensed to consumers.

13. Between each step in the delivery chain of refined fuels, copious amounts of data are exchanged between the refineries, terminals, dispatchers, carriers, and downstream consumers and retailers. This data is often exchanged in raw or proprietary formats which leads to inefficiencies caused by the need to translate various invoices, forms, and orders before they can be referenced against inventory figures and supply allotments.

14. DTN creates value through standardizing, aggregating, and distributing customer-specific refined fuels data across the supply chain, enabling participants to operate from a common, reliable set of information. DTN's platforms ingest data from refineries, terminals, carriers, and retailers, normalize that data into consistent formats, and deliver real-time insights regarding pricing, inventory levels, supply availability, logistics, and delivery timing.

*The Form*

15. As part of its work in the refined fuels subsector, DTN develops and maintains a proprietary Invoice Outbound Specification Form (the "Form" or "Work") that governs how supplier fuel invoices are parsed, translated, and transmitted for ingestion by downstream customer systems through DTN's messaging and translation services. The specification defines the file structure and record flow (including Header, Item, RINS, Item Tax, Summary Tax, Deferred Tax, and Footer records), field names, data types, maximum lengths, required or optional statuses, and detailed explanatory commentary. A true and correct copy of the Form is being filed concurrently herewith under seal as Exhibit A.

16. DTN also operates the DTN TABS® (Transportation Allocation & Billing System) ecosystem and related Application Programming Interfaces ("API") that interface with terminal

automation systems and market participants. The accuracy and integrity of invoice data—and the specification used to carry that data—are critical to DTN's offerings and customer relationships.

17. DTN treats the Form and related mappings as confidential and proprietary information. In addition to holding valid copyrights over the Form (Registration Nos. TX009570177 and TX009561787), DTN restricts distribution of the Form to customers and permitted third parties subject to contractual confidentiality obligations. The Form expressly states that it is proprietary to DTN and may not be disclosed to third parties without DTN's written consent. DTN sought and obtained registration of the Form with the United States Copyright Office in February 2026 after learning of Defendants' misappropriation. The Copyright Act permits registration of an original work of authorship at any time before suit, and registration is not required to perfect a copyright; DTN registered to clear the statutory prerequisite for federal copyright litigation. The materials submitted in connection with registration did not include, and registration does not encompass, the mappings, allocation logic, reconciliation processes, validation rules, or TABS API specifications that DTN maintains as separate trade secrets and that are further described below. Registration of the Form's copyright did not forfeit or extinguish the trade-secret status of DTN's confidential materials. Copyright registration and trade-secret protection are not mutually exclusive, and a copyright owner does not surrender trade-secret protection in confidential underlying materials merely by registering a work. DTN's trade secrets—its data mappings, allocation logic and reconciliation processes, validation rules and exception-handling procedures, and TABS API specifications and internal data models—were not submitted to or deposited with the Copyright Office, are not ascertainable from the registered Form, and have at no time been disclosed to the public or to Defendants other than under the confidentiality restrictions of the TPP Agreements.

18. The Form is not an abstract industry guideline. It is the direct output definition of DTN's invoice translation and messaging services and reflects years of investment, technical expertise, and operational experience in refining, normalizing, and validating invoice data originating from disparate terminals, suppliers, and carriers across the United States.

19. Consistent with industry practice, DTN has, in limited circumstances, permitted certain non-competing third-party processors to view or ingest invoice data in DTN's proprietary format solely to display translated invoices within those processors' systems. DTN required each such third-party processor to execute a Third-Party Processor Agreement ("TPP Agreement") containing express confidentiality, non-disclosure, and anti-reverse-engineering obligations restricting use of the format specification and prohibiting copying, redistribution, or reverse engineering. Any such access was permissioned, attribution-controlled, and did not authorize copying, redistribution, or use of the specification to bypass or replace DTN's services. At no time has DTN published, sold, or otherwise made the format specification document available to the general public.

*The Misappropriation of the Form*

20. Gravitate and capSpire are energy-industry technology and consulting companies that serve many of the same customers as DTN. Until mid-2024, Gravitate operated as a product line or trade name within capSpire. In June and July 2024, Gravitate was spun out into a standalone Delaware limited liability company, while capSpire simultaneously converted into a Delaware limited liability company. Both entities announced separate growth investments from private-equity firm Falfurrias Management Partners in July 2024.

21. Following the spin-off, Gravitate and capSpire, now separate entities, have wrongfully shared DTN's confidential and proprietary information and coordinated to align

commercial strategy, customer engagement, and technical development in ways relevant to the conduct alleged in this Complaint.

22. In January 2026, DTN learned from one of its customer suppliers that a customer of DTN's customer, Costco Wholesale Corporation ("Costco"), had forwarded to DTN's customer a document titled "Supplier Invoice Requirement Sheet" (the "Copy") that Gravitate had distributed to market participants. DTN's customer subsequently provided the document to DTN. Because the Copy is a near-verbatim copy of DTN's confidential and proprietary Form, like the Form, DTN is filing it under seal as Exhibit B.

23. DTN performed a detailed comparison between the Gravitate "Supplier Invoice Requirement Sheet" and DTN's proprietary Form. That comparison revealed near-verbatim copying of DTN's Form.

24. Gravitate's Copy replicates DTN's overall document structure, section order, record architecture, tables, field definitions, data types, maximum field lengths, required or optional designations, and explanatory commentary, with only minor cosmetic edits.

25. Rather than independently designing a specification, Gravitate simply relabeled DTN-specific fields with generic substitutes while retaining the same structure, semantics, and constraints. For example, fields labeled with DTN branding were renamed using generic terminology without altering their function or meaning. These substitutions do not reflect independent development but instead demonstrate Gravitate's direct copying of DTN's protected work.

26. Gravitate modified certain required or optional designations in the Copy to compel suppliers to transmit data—such as gross gallons and supplier-level transaction identifiers—that DTN historically designated as optional or context-specific. These changes were designed to allow

Gravitate to collect data otherwise unavailable to it, enabling reverse-engineering of DTN's reconciliation, allocation, and market-insight processes.

27. Gravitate's changes to required/optional fields were intended to harvest additional data not necessary for a buyer's payment reconciliation but useful to recreate DTN's proprietary insights and to reverse-engineer DTN's allocation and reconciliation logic.

28. DTN further learned that Gravitate used the Copy to request that suppliers send invoices directly to Gravitate in the copied DTN format. Gravitate's objective was to bypass DTN's translation and messaging services entirely and to redirect invoice traffic away from DTN and into Gravitate-controlled workflows to wholly disintermediate DTN.

29. The Copy is held out by Gravitate as Gravitate's own "requirement," obscuring DTN's authorship and provenance of the format and creating market confusion as to the origin, ownership, and sponsorship of the invoice specification and the services associated with it.

*Gravitate and capSpire's Other Conduct*

30. This conduct did not occur in isolation.

31. Prior to discovery of the Copy, DTN personnel observed a pattern of behavior by Gravitate and capSpire involving efforts to access DTN systems and workflows under false or misleading pretenses.

32. In at least one incident, capSpire personnel impersonated DTN customers when contacting DTN's support desk.

33. Between 2024 and 2025, Gravitate and capSpire employees repeatedly contacted DTN's API and product-support teams with detailed questions about DTN's internal data models, allocation logic, identifier persistence, and system behavior. These inquiries exceeded typical customer use questions and aligned with attempts to reproduce DTN functionality without authorization.

34. Gravitate also inserted itself into contract negotiations between DTN and mutual customers, urging those customers to assert expansive data-ownership positions and to demand broader third-party processor rights that would allow Gravitate access to DTN-processed outputs beyond the scope of DTN's standard agreements.

35. Historically, where DTN worked with third-party processors, DTN required a signed TPP Agreement and maintained controls to protect DTN's proprietary formats and value-added data.

36. In early 2024, capSpire executed TPP Agreements as "capSpire, Inc. (DBA Gravitate and capSpire)," confirming that Gravitate then operated only as a trade name under capSpire.

37. By 2025, customers began identifying Gravitate Energy, LLC as the third-party processor—reflecting the previously described spin-off.

*The Harms to DTN*

38. Defendants' shift from cooperation under TPP Agreements to copying and relabeling DTN's Form, coupled with supplier solicitations to send data in the copied format, was calculated to reroute invoice data flows away from DTN and erode DTN's longstanding customer relationships.

39. The invoice-translation and messaging channel at issue is a significant line of DTN's business, representing substantial annual revenue and forming a core component of DTN's integrated fuel-operations ecosystem. DTN has invested millions of dollars over many years to develop its specifications, mappings, validation logic, and messaging infrastructure.

40. By copying and redistributing DTN's Form and using it to reroute supplier invoice traffic, Gravitate has sought to free-ride on DTN's investments, disintermediate DTN from established customer relationships, erode DTN's goodwill, confuse the market about the origin

and ownership of the format and related services, and appropriate DTN's competitive advantages without incurring the cost or effort required to develop them.

41. DTN has suffered and continues to suffer harm because of Gravitate's conduct, including diversion of invoice flows, loss of goodwill, customer confusion, and damage to DTN's competitive position. Absent injunctive relief, DTN faces ongoing and irreparable harm from the continued use and dissemination of its proprietary specification.

42. In addition to Gravitate's wrongful conduct, Defendants have jointly coordinated to leveraging capSpire's existing customer relationships and the confidential information capSpire obtains through providing its consulting services to steer those customers toward Gravitate's products.

43. capSpire provides extensive consulting, integration, and managed-services to customers in the refined fuels sector, including development and automation, risk analytics, system health checks, end-to-end testing, performance optimization, cloud infrastructure, and security.

44. According to reports from customers and prospective customers of DTN, capSpire leverages its market position and non-public insights into customer operations to coerce them into purchasing Gravitate's products, which compete directly with DTN's products in the refined fuels market.

45. Many of these customers and potential customers would prefer to use other competing products, including DTN's products, over Gravitate's products but feel they must choose Gravitate's products due to capSpire's coercive pressure.

46. Upon information and belief, capSpire and Gravitate have engaged in this coordinated course of conduct expressly and intentionally, with the purpose of giving Gravitate an unfair advantage in soliciting DTN's customers and diverting business from DTN to Gravitate.

47. This conspiracy has harmed DTN through both the loss of customers and potential customers.

## CAUSES OF ACTION

### COUNT I
***Copyright Infringement (17 U.S.C. § 501)***

48. DTN incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

49. DTN owns valid copyrights in the Form at issue in this case.

50. DTN registered the Form and its succeeding iterations with the Register of Copyrights pursuant to 17 U.S.C. § 411(a).

51. The work is copyrightable expression, including the selection, coordination, and arrangement of fields, record architecture, and explanatory commentary.

52. Defendants copied, displayed, and distributed the Form without DTN's authorization in violation of 17 U.S.C. § 501.

53. Prior to the mid-2024 spin-off, Gravitate operated as a product line and trade name within capSpire. During that period, any creation, modification, distribution, or display of the Copy or its precursor materials was performed by capSpire personnel acting on behalf of, and as, capSpire. To the extent the Copy was developed, refined, or first distributed during this period, capSpire is liable as a direct infringer.

54. Following the mid-2024 spin-off, capSpire and Gravitate continued under common majority ownership by Falfurrias Management Partners and shared management, including Bernard Wehbe, who serves as a governing person of both entities. capSpire had the right and ability to supervise Gravitate's distribution of the Copy through these shared-governance and ownership channels and derived a direct financial interest in Gravitate's infringing activity, both

through Falfurrias's common ownership stake and through capSpire's own customer-steering activities that directed business to Gravitate. capSpire is therefore liable as a vicarious infringer.

55. capSpire also knew of, induced, and materially contributed to Gravitate's infringing conduct. capSpire personnel made repeated detailed inquiries to DTN's API and product-support teams concerning DTN's internal data models, allocation logic, identifier persistence, and system behavior; in at least one instance impersonated DTN customers to obtain non-public information; and steered mutual customers toward Gravitate's services that depended on the Copy. With knowledge of Gravitate's infringing distribution of the Copy, capSpire materially contributed to that infringement and is liable as a contributory infringer.

56. capSpire is jointly and severally liable for the infringement as a direct, contributory, and/or vicarious infringer.

57. Defendants performed the acts alleged in the course and scope of their business activities.

58. As Defendants had actual knowledge that they did not have authority to reproduce, distribute, or display the Form for any purpose, their unauthorized use of the Form constitutes willful conduct.

59. DTN has been damaged.

60. Defendants' acts constitute infringement under 17 U.S.C. § 501. DTN seeks injunctive relief, impoundment and destruction of infringing copies, actual or statutory damages, and attorneys' fees and costs.

## COUNT II
### *Misappropriation of Trade Secrets*
### *(Defend Trade Secrets Act, 18 U.S.C. § 1836)*

61. DTN incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

62. DTN possesses highly unique and valuable information, including its non-public specification, mappings, and associated know-how which constitute trade secrets. This compiled information is confidential, proprietary, and derives independent economic value from not being generally known. DTN's trade secrets include, without limitation, (i) the Form specification document; (ii) DTN's data mappings, including the relationships between source-supplier data fields and DTN's normalized output fields; (iii) DTN's allocation logic and reconciliation processes; (iv) DTN's validation rules and exception-handling procedures; and (v) the TABS API specifications and related internal data models. These materials were not deposited with the United States Copyright Office in connection with DTN's copyright registrations and have not been disclosed publicly. Gravitate has itself acknowledged, by contract, the trade-secret status of these materials: in the TPP Agreement it executed in 2025 (Rev. 1/2025), Gravitate agreed that the "Proprietary Elements represent valuable trade secrets of DTN, and any attempt to derive or discover such elements would cause irreparable harm to DTN."

63. Defendants each acquired, disclosed, and/or used DTN's trade secrets without consent, knowing or having reason to know that the information was obtained through improper means or in breach of a duty of confidentiality, and in a manner affecting interstate commerce.

64. DTN is headquartered in Minnesota but operates and regularly transacts business in other states, including in person and by phone, internet, and mail. DTN's trade secrets relate to this business and are used by DTN in interstate commerce.

65. DTN has taken reasonable measures to keep its trade secrets secret and confidential, including but not limited to limiting electronic access to password-protected systems, restricting access to identified personnel with a business need, requiring all employees with access to execute confidentiality and non-disclosure agreements, requiring all third-party processors with access to

execute Third-Party Processor Agreements containing express confidentiality and anti-reverse-engineering obligations, segregating trade-secret materials so that only authorized personnel can access them, maintaining IT-security controls including audit logging and monitoring of FTP-system access, and requiring its employees and affiliates with access to execute confidentiality and non-disclosure agreements.

66. DTN's Form—in all iterations, and as amended and updated from time to time—has independent economic value because it is not generally known to and not readily ascertainable by persons other than DTN who could obtain economic value from its disclosure or use. DTN compiled its confidential and trade secret information over many years and at great expense.

67. Defendants, by engaging in and continuing to engage in the conduct and activities described herein, have violated the Defend Trade Secrets Act ("DTSA") through their improper acquisition, disclosure, and use of the Form, which constitutes both actual and threatened misappropriation. Defendants had, and continue to have, access to DTN's trade secrets.

68. Gravitate has used, and upon information and belief continues to use, DTN's trade secrets. Gravitate has already demonstrated actual use of DTN's trade secrets by copying the Form, distributing the Copy to market participants, and using misappropriated specifications to solicit DTN's customers. Defendants have used, and upon information and belief continue to use, DTN's trade secrets. Gravitate has demonstrated actual use of DTN's trade secrets by copying the Form, distributing the Copy to market participants, and using misappropriated specifications to solicit DTN's customers. capSpire has demonstrated actual use of DTN's trade secrets by, among other things, impersonating DTN customers to obtain non-public information from DTN's support desk; making repeated detailed inquiries to DTN's API and product-support teams designed to extract proprietary information about DTN's data models, allocation logic, identifier persistence, and

system behavior; and coordinating with Gravitate to incorporate DTN's misappropriated trade secrets into the Copy and into Gravitate's competing services. Given the similarities between DTN's and Gravitate's businesses and the fact that DTN and Gravitate are direct competitors, there is a substantial threat that Defendants will continue to use and/or disclose DTN's trade secrets.

69. DTN has suffered, and will continue to suffer, irreparable harm as a result of Gravitate's unlawful conduct and the disclosure and misappropriation of DTN's confidential information and trade secrets. Gravitate's activities will result in a substantial loss of business for DTN, now and in the future. DTN has no adequate remedy at law because Gravitate's actions are affecting DTN's goodwill, reputation, and ability to compete in a highly competitive marketplace. DTN is therefore entitled to injunctive relief to prevent further irreparable harm under the DTSA.

70. Defendants' actions were willful, malicious, and intended to injure DTN and its business.

71. As a direct and proximate result of Defendants' misappropriation, DTN has suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm, injury, and damages, including but not limited to loss of relevant market share, injury to business reputation and goodwill, loss of profits, and attorneys' fees and costs. Defendants have gained an unfair competitive advantage and other unjust enrichment through the misuse of DTN's Form.

72. Under the DTSA, DTN is entitled to and requests permanent injunctive relief against Defendants to prohibit Defendants' use of DTN's trade secret information.

73. Under the DTSA, DTN is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, including without limitation lost profits; disgorgement of any profits to Defendants as a result of the misappropriation; damages for all

unjust enrichment caused by the misappropriation; and damages in the form of a reasonable royalty for the unauthorized use and/or disclosure of DTN's Form.

74. Under the DTSA, DTN is entitled to and requests exemplary damages in an amount not more than two times DTN's actual damages, plus reasonable attorneys' fees. DTN is entitled to injunctive relief, damages for actual loss and unjust enrichment, exemplary damages for willful and malicious misappropriation, and attorneys' fees.

**COUNT III**
***Misappropriation of Trade Secrets***
***(Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001)***

75. DTN incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

76. Texas has adopted the Texas Uniform Trade Secrets Act ("TUTSA"). TEX. CIV. PRAC. & REM. CODE § 134A.001, *et seq.*

77. Under the TUTSA, a trade secret includes, but is not limited to:

> all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
>
> (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002.

78. The TUTSA defines "misappropriation" as the

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > (i) used improper means to acquire knowledge of the trade secret;
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
> >
> > > (a) derived from or through a person who used improper means to acquire the trade secret;
> > >
> > > (b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or
> > >
> > > (c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or
> >
> > (iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake . . . .

TEX. CIV. PRAC. & REM. CODE § 134A.002.

79. The TUTSA provides that an owner of a trade secret may bring a civil action to enjoin any actual or threatened misappropriation of a trade secret. TEX. CIV. PRAC. & REM. CODE § 134A.003.

80. The trade secrets identified in Paragraph 62—including the Form, DTN's data mappings, DTN's allocation logic and reconciliation processes, DTN's validation rules and exception-handling procedures, and the TABS API specifications and related internal data models—are DTN's trade secrets subject to protection under the TUTSA. Gravitate has contractually acknowledged the trade-secret status of these materials and the irreparable harm their derivation would cause, having agreed in the TPP Agreement it executed in 2025 (Rev. 1/2025)

that the "Proprietary Elements represent valuable trade secrets of DTN, and any attempt to derive or discover such elements would cause irreparable harm to DTN."

81. The information contained in the trade secrets identified above is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. DTN has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

82. DTN takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; (e) and IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

83. Defendants obtained the trade secrets by improper means in violation of the TUTSA.

84. Defendants' conduct constitutes an actual and threatened misappropriation and misuse of DTN's trade secret information in violation of the TUTSA.

85. Defendants improperly acquired and retained DTN's trade secret information for the purpose of using, disclosing, and/or copying such information to compete with DTN.

86. As competitors of DTN or persons acting in concern with such competitors, Defendants have used and upon information and belief will continue to use and/or disclose DTN's trade secret information to other competitors and DTN's prospective and current customers, as Defendants have already demonstrated actual misappropriation through their copying, distribution,

and use of the Form and through capSpire's impersonation of DTN customers and reverse-engineering inquiries described above.

87. Defendants engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty they breached.

88. Defendants, as a licensees and counterparties under TPP Agreements of DTN, owed and continues to owe DTN a duty to maintain the secrecy of DTN's trade secret information.

89. DTN's TUTSA claim is qualitatively different from, and is not equivalent to, its copyright claim, and is not preempted by the Copyright Act. The TUTSA claim does not rest on mere copying of the Form. It rests on Defendants' acquisition, disclosure, and use of DTN's trade secrets through breach of the confidential relationship established by the TPP Agreements and through improper means—including capSpire's impersonation of DTN customers to extract non-public information from DTN's support desk, and Defendants' pretextual inquiries to DTN's API and product-support teams designed to derive DTN's data models, allocation logic, identifier persistence, and methodologies. Proof that DTN's trade secrets were taken through breach of a confidential relationship or by improper means is an element required for the TUTSA claim that is not required to establish copyright infringement, and that extra element places DTN's trade-secret claim outside the scope of copyright preemption.

90. As a direct and proximate result of Defendants' actual and threatened misappropriation of DTN's trade secrets, DTN has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Defendants are enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to DTN.

91. As a direct and proximate result of Defendants' misappropriation, DTN has suffered and continues to suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the TUTSA.

92. The actions of Defendants were made intentionally, willfully, or with reckless indifference to the rights of DTN, thereby entitling DTN to an award of punitive damages to be proved at trial.

## COUNT IV
***Breach of Contract***

93. DTN incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

94. DTN's Form was provided to certain partners and customers subject to agreements restricting disclosure and use.

95. Among the various agreements restricting the disclosure and use of the Form and DTN TABS® Allocation API (the "TABS API") were various TPP Agreements and/or Supplements executed by (i) capSpire, including TPP Agreements executed in early 2024 under the signing capacity "capSpire, Inc. (DBA Gravitate and capSpire)," which by their terms bound capSpire and its trade name Gravitate; and (ii) following the mid-2024 spin-off of Gravitate into a separate entity, Gravitate Energy, LLC, which assumed and continued performance under the operative TPP Agreements and entered into additional TPP Agreements in its own name. The TPP Agreements capSpire executed in early 2024 were signed on February 6, 2024, by Bernard Wehbe, in his capacity as Chief Operating Officer of "capSpire, inc. (DBA Gravitate and capSpire)." Each such TPP Agreement further provides, at Paragraph 12, that no consent to assignment is required where the transfer is made as a result of, among other things, a "corporate reorganization" or "a corporate name change." The mid-2024 transaction by which Gravitate was separated from

capSpire constituted such a corporate reorganization, and the obligations of the operative TPP Agreements accordingly passed to and bound Gravitate Energy, LLC as successor in interest, in addition to the TPP Agreements that Gravitate Energy, LLC executed in its own name.

96. To the extent Defendants accessed DTN's Form through relationships governed by TPP Agreements or other agreements, Defendants breached those agreements and/or DTN is an intended third-party beneficiary of common-client license agreements that Defendants violated.

97. The TPP Agreements are valid and enforceable contracts between DTN and Defendants.

98. Under the TPP Agreements, DTN provided Defendants with access to certain portions of the TABS API to facilitate the delivery of data.

99. DTN has fulfilled all of its obligations under the TPP Agreements.

100. Defendants have breached the TPP Agreements by violating, among other provisions, the anti-reverse-engineering and confidentiality provisions of the TPP Agreements. The TPP Agreements that capSpire executed (Rev. 4/2022) provide, at Paragraph 1, that, as between the processor, the client, and DTN, the licensed Data "is and shall remain the sole property of DTN," and that the processor "shall do nothing inconsistent with the copyright or other proprietary rights of DTN in and to the Data without the express written consent of DTN." Paragraph 4 of those Agreements provides that, "[e]xcept as expressly set forth in this Supplement, Processor will not reverse engineer, use, sell or resell, reproduce or disclose the Data for any reason." The Form, together with the field structure, data definitions, mappings, and enrichments it embodies, constitutes DTN's proprietary Data and proprietary information within the meaning of these provisions. capSpire breached these provisions—and Gravitate Energy, LLC, as successor in interest bound by these Agreements under Paragraph 12, likewise breached them—by copying

the Form, modifying its required and optional field designations to extract additional proprietary data, distributing the resulting Copy to market participants, and using DTN's proprietary specifications to solicit DTN's customers.

101. Defendants further breached the confidentiality provisions of the TPP Agreements. Those same Agreements further provide, at Paragraph 2, that the processor "shall not duplicate, aggregate, or compile any Data or provide the same in any form to any person or party," other than for the exclusive benefit of the client, "without the express written consent of DTN." Paragraph 3 provides that, except as done at the request and for the exclusive benefit of the client, the processor "shall not conduct any analyses of the Data or otherwise use it to understand the nature, character or quality of the Data," nor use information it obtains from its handling or possession of the Data "in connection with the creation, testing, promotion, marketing, selling and/or licensing of Processor's information, products or services." capSpire breached these provisions, and Gravitate as successor likewise breached them, by reproducing and relabeling DTN's Form as the Copy, providing the Copy to Costco, to suppliers, and to additional market participants without DTN's consent, and by using information derived from their handling and possession of DTN's Data to develop, test, and promote Gravitate's competing services.

102. Separately, the TPP Agreement that Gravitate Energy, LLC executed in its own name (Rev. 1/2025) contains an express anti-reverse-engineering covenant. Paragraph 2 of that Agreement provides that the processor "shall not, directly or indirectly, reverse engineer, decompile, disassemble, or otherwise attempt to derive, analyze, or discover any algorithms, processes, methodologies, or other proprietary information or enrichments relating to the API or other proprietary intellectual property of DTN"—defined as the "Proprietary Elements"—and that the processor "shall not use any means, whether manual, automated, or otherwise, to examine,

study, or test the Data for the purpose or with the effect of determining or extracting any Proprietary Elements." In the same provision, the processor acknowledged "that the Proprietary Elements represent valuable trade secrets of DTN, and any attempt to derive or discover such elements would cause irreparable harm to DTN." Gravitate breached Paragraph 2 by modifying the required and optional field designations of the copied Form to compel suppliers to transmit data that DTN had designated optional, for the purpose and with the effect of deriving DTN's allocation, reconciliation, and market-insight methodologies—the very Proprietary Elements the provision protects.

103. The independent-development carve-out in the same Paragraph 2 does not excuse Gravitate's conduct. That carve-out preserves only "Processor IP" that Gravitate develops "independently of, and without reference to, the Proprietary Elements." Gravitate's near-verbatim copying of the Form, and its targeted modification of the Form's field designations to derive DTN's methodologies, were undertaken with direct reference to—indeed, in reliance upon—DTN's Proprietary Elements, and therefore fall outside the carve-out. Paragraph 2 further provides that nothing in the Supplement shall "operate as a waiver of any rights or protections provided under applicable law," preserving DTN's copyright and trade-secret rights in all events.

104. As a direct and proximate result of Defendants' failure to comply with the TPP Agreements, DTN has suffered damages, including (i) lost revenue from invoice flows diverted from DTN to Gravitate, including but not limited to invoice flows associated with Costco and its upstream suppliers identified in Paragraph 22; (ii) lost revenue from DTN customers and prospective customers who, as a result of Defendants' breaches, terminated, declined to expand, or declined to enter into business relationships with DTN; (iii) costs of investigation, forensic analysis, and remediation of Defendants' misuse of DTN's systems and information; and (iv)

attorneys' fees as recoverable under applicable law. A substantial portion of DTN's lost-revenue damages is attributable to the diversion of the Costco-related invoice flows away from DTN's translation and messaging services.

**COUNT V**
***Tortious Interference***

105. DTN incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

106. As described in this Complaint, DTN has valid, existing, and prospective business relationships with its current customers and with identifiable prospective customers in the refined fuels sector, including without limitation Costco's upstream suppliers identified in Paragraph 22.

107. DTN's existing contractual and business relationships include its relationship with Costco in the refined fuels sector. Defendants knew of DTN's existing relationship with Costco and intentionally interfered with it by relabeling DTN's Form and using it to induce Costco, and the suppliers serving Costco, to route invoice data to Gravitate rather than DTN—disrupting DTN's relationship with Costco and diverting the Costco-related invoice flows away from DTN.

108. Defendants have willfully and intentionally interfered with these existing and prospective business relationships.

109. Defendants have induced, or attempted to induce, DTN's customers to reduce their business relationship with DTN and instead do business with Gravitate, and there was a reasonable probability that DTN would have entered into or continued the relevant business relationships absent Defendants' wrongful interference.

110. Specifically, Defendants knew of DTN's customer relationships and expectancy interests, including with Costco and its upstream suppliers, because Defendants serve many of the

same customers who engage DTN directly regarding specifications, APIs, and third-party processor arrangements.

111. Gravitate relabeled DTN's proprietary Form and distributed it to Costco, which then passed it to a DTN customer with instructions to send invoices directly to Gravitate in DTN's format, thereby bypassing DTN's translation and messaging services. Defendants altered optional fields to mandatory, not to facilitate payment by Costco but to enable Defendants to reverse-engineer DTN's reconciliation and allocation logic and to disintermediate DTN from the transaction flow.

112. Defendants coached mutual customers to assert expanded "data-ownership" positions and to demand broader third-party processor rights that would open DTN-processed outputs to Gravitate beyond the scope of DTN's standard agreements. Further, capSpire personnel previously impersonated customers contacting DTN's support desk—conduct that further evidences a course of deceptive interference.

113. capSpire leveraged its position as a dominant and indispensable systems-integrator and consultancy for energy-sector customers—including those relying on capSpire for enterprise C/ETRM and related technology deployments—to pressure and coerce mutual customers into adopting Gravitate's competing dispatch, invoice-routing, and data-ingestion services, even where those customers may have preferred to use DTN. By conditioning or effectively tying continued access to capSpire's consulting or implementation support on the adoption of Gravitate's offerings, capSpire steered business away from DTN and disrupted DTN's established and prospective relationships.

114. To reinforce this redirection, Defendants propagated DTN's Form and encouraged suppliers to route invoice data to Gravitate rather than DTN—conduct that included Costco-related

flows—thereby interfering with DTN's customer relationships and the data channels on which those relationships depend.

115. Defendants' acts are independently tortious because they involved (i) deceptive conduct, including capSpire's impersonation of DTN customers to obtain non-public information; (ii) coercion of mutual customers through capSpire's leveraging of its consulting and integration relationships to condition continued service on adoption of Gravitate's competing offerings; (iii) interference with DTN's contractual rights under existing TPP Agreements with capSpire and Gravitate; and (iv) other deceptive and improper efforts to disrupt DTN's customer relationships—including coordinated steering of customers away from DTN, interference in ongoing negotiations, and other wrongful competitive conduct that is actionable apart from any trade-secret-related allegations.

116. Defendants did such acts knowing that their interference with DTN's prospective business relationships was certain, or substantially certain, to occur as a result of such conduct.

117. Defendants' interference is not privileged or justified; it is a targeted campaign to reroute invoice data flows and appropriate DTN's channel and goodwill by confusion and coercion rather than by fair competition.

118. As a result of Defendants' interference with DTN's prospective business relationships, DTN has suffered actual and irreparable damage, including, among other things, diversion of invoice traffic, loss of revenue, loss of goodwill, damage to its reputation, diminished competitive standing, and other pecuniary loss. Based on Defendants' unlawful interference, DTN is entitled to all actual damages proximately caused by Defendants' acts of interference in an amount within the jurisdictional limits of this Court. Additionally, DTN is entitled to exemplary damages because Defendants' acts of interference were willful and malicious.

119. Unless and until Defendants are enjoined by this Court, Defendants will continue to commit acts of tortious interference, and will continue to cause irreparable harm to DTN.

**COUNT VI**
***Conspiracy***

120. DTN incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

121. To the extent Gravitate acted in concert with capSpire to interfere tortiously with DTN's prospective business relationships, both Defendants are jointly and severally liable for the wrongful acts committed in furtherance of the conspiracy.

122. Gravitate and capSpire have knowingly encouraged, participated in, and benefited from the wrongful conduct described in this Complaint. A civil conspiracy exists under the facts of this case because two or more persons have acted in collusion to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

123. Gravitate has engaged in a civil conspiracy with capSpire totortiously interfere with DTN's prospective business relationships as described in Count V above, through the independently tortious acts of customer impersonation, coercion of mutual customers, and interference with DTN's contractual relationships including DTN's existing contractual relationship with Costco, all of which are independent of and not preempted by any trade-secret or copyright claim.

124. Gravitate and capSpire have associated together through a meeting of their minds and for a common purpose of engaging in a course of conduct, and as an ongoing and continuing organization or unit, to conduct the unlawful and tortious activities described in this Complaint. Notwithstanding any common ownership interest of Falfurrias Management Partners in each of Gravitate and capSpire, the two entities are separately formed Delaware limited liability companies

with separate management of operations, separate Texas foreign-entity registrations, separate customer contracts (including separate TPP Agreements with DTN), and separate revenue streams from distinct product and service offerings. They are not a parent and wholly-owned subsidiary, and they are capable of conspiring under Texas law.

125. Gravitate and capSpire have conspired among themselves to devise and implement wrongful and unlawful schemes to tortiously interfere with DTN's prospective business relationships.

126. Accordingly, DTN has been, and continues to be, damaged in its business. DTN is entitled to all damages caused by this conspiracy as well as exemplary damages.

## CONDITIONS PRECEDENT

127. All conditions precedent to DTN's claims, if any, have occurred, have been performed, are excused, and/or are waived.

## PRAYER

DTN, LLC respectfully requests the Court enter a judgment in its favor for the following relief:

A. A preliminary and permanent injunction prohibiting Defendants from copying, distributing, or using DTN's Form or any derivative works;

B. An order requiring Defendants to recall, deliver up, and destroy all copies of the infringing "Supplier Invoice Requirement Sheet" and any materials derived therefrom;

C. An award for all damages sustained by DTN as a result of Defendants' copyright infringement, including actual damages and Defendants' profits or, at DTN's election, statutory damages, and attorneys' fees;

D. An award for all damages sustained by DTN as a result of Defendants' trade secret misappropriation under DTSA and TUTSA, including injunctive relief, compensatory damages, unjust enrichment, exemplary damages, and attorneys' fees;

E. An award of all damages sustained by DTN as a result of Defendants' breach of contract, including attorneys' fees as recoverable under applicable law;

F. An award of all damages sustained by DTN as a result of Defendants' tortious interference and/or conspiracy as allowed by law;

G. In the alternative to breach of contract damages, an award for unjust enrichment, including disgorgement of all benefits Defendants obtained through misappropriation of DTN's proprietary work product and unauthorized use of DTN's systems;

H. An award of all pre-judgment and post-judgment interest at the maximum allowable rate under applicable law;

I. All costs of court and, as contractually and/or statutorily allowed, all other costs incurred by DTN to recover amounts owed to it;

J. All reasonable and necessary attorney's fees; and

K. Such other and further relief to which DTN may be justly entitled.

Dated: June 10, 2026

Respectfully submitted,

*/s/ Samuel E. Joyner*
Samuel E. Joyner (TX Bar No. 24036865)
Kaitlyn Q. McCall (TX Bar No. 24131013)
**FBT GIBBONS LLP**
2101 Cedar Springs Road, Suite 900
Dallas, TX 75201
Telephone: (214) 545-3472
Facsimile: (214) 545-3473
sjoyner@fbtgibbons.com
kmccall@fbtgibbons.com

Brad S. Keeton (*pro hac vice*)
Austin R. Brinkley (*pro hac vice*)
**FBT GIBBONS LLP**
325 West Main Street, Suite 301
Lexington, KY 40507
Telephone: (859) 231-0000
Facsimile: (859) 231-0011
bkeeton@fbtgibbons.com
abrinkley@fbtgibbons.com

*Counsel for Plaintiff*
*DTN, LLC*

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Civil Procedure 5, I hereby certify that on June 10, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record registered with the Court's CM/ECF system.

*/s/ Samuel E. Joyner*
Samuel E. Joyner

0161335.0820254 4924-5319-9026v1